Good morning, Illinois Appellate Court, 1st District Court is now in session, the 2nd Division, the Honorable Justice Margaret S. McBride presiding, case number 23-1381, Hampton v. Metropolitan Water Reclamation District of Greater Chicago. Good morning, everyone. My name is Margaret McBride. I will be presiding over this appeal with Justices House and Ellis. Before we begin, I would first like for the attorneys to identify yourselves for the record. First, could we hear the name of the attorney for the appellant? Good morning, Justice McBride. My name is Glenn Dunn, and I am the attorney for the appellants, the plaintiffs who sued the MWRD in this underlying action. Good morning. Counsel for Appellee? Good morning, Your Honor. George Mihalopoulos on behalf of the MWRD. Mr. Mihalopoulos, good morning. I may just refer to you as counsel. Anyway, good morning to you both. So our procedure has been at Zoom Orals that each side will have about 10 minutes to present oral argument. Obviously, appellant will go first. Then we will have an opportunity to ask questions after that. Appellee will have about the same time, 10 minutes, to present oral argument, and then we will have questions from the panel. And then, Mr. Dunn, after that, you'll have some brief time for rebuttal. So with that, we may begin. And Mr. Dunn, counsel, you may proceed. Very good. Thank you, Justice McBride, and if it pleases the court. I know that we have 10 minutes and I have prepared some remarks regarding some things that we've raised in our brief. However, the record in this case is enormous and there are many dense issues. If the court would rather focus my attention on questions, I'm happy to do that. But if the court would rather have me begin my arguments, whatever pleases the court, I'm happy to do that. Well, I think, you know, perhaps the most significant issue is that whether or not we have jurisdiction over the Section 19 claim. There are a lot of issues involved in the meat of this case. So that's my suggestion. If you wish to briefly comment on the jurisdiction issue, you may. But if you want to really get into the case itself and the merits, I would suggest you do that. Very good, Your Honor. I'm not going to waste a lot of time on the Section 19 other than to say that in the gentleman decision, the gentleman court, they did make one observation about extending Section 19 beyond the construction of the sanitary canal back in 1870. And they made this quotation. It's at page 320 of the gentleman opinion. And it said the purpose of Section 19 is no other corporation, a sanitary district or the MWRD, has powers commensurate with those of the sanitary district. And their capacity to inflict damage reaches far beyond their own territory and affects a wide area. And I'll leave the rest. I think it's all in the brief on Section 19. Let me refocus myself on the other arguments as it relates to Judge Cohen's order on summary judgment. And what we propose is his failure to address the factors as outlined by Arkansas Game and Fish and as adopted by the Hampton Supreme Court when we argued that several years ago. One thing I would jump right to is that one of the main issues that Judge Cohen took issue with was this causation, that we had not proven causation or we didn't address the but-for causation. And we submit that that's just plainly wrong. And I think that perhaps Judge Cohen, who's an excellent judge and has presided over this case for many years, what he missed is that he saw that Mr. Garcia or Dr. Garcia, the expert for the MWRD, had used a number of models. The HEC-RAS model, the SWMM model, and the NEXT-RAD software that projected and estimated rainfall totals based on radar or cloud cover. And that's because he had used all those models in that software, the fact that Dr. Bedian did not create his own models seemed to weigh heavily in his decision. But just as an upstream addicts where Dr. Bedian was also the expert, it is not required in order to establish a takings or a constitutional damages claim under the additional protections of the Illinois takings clause for us to do our own modeling. In fact, it's easier, I think, for the jury to appreciate and understand the issues when we base it off the same models. And that's exactly what he did. Dr. Bedian testified that his assistant, Dr. Andrew Wan, who's been with him for 25 years, has his PhD, re-ran the models that Dr. Garcia had done. And this is a critical point. It's very dense in the facts. But what the MWRD did is they took a 100-year rainfall, which should have produced a 100-year flood, and they injected bias into each of their estimates, into the HEC-RAS model, into the SWMM model, and into the NEXT-RAD model in particular, by multiplying the projected rainfall up to a factor of 1.5. So every part of their – they were tweaking their model to output a flood severe enough to justify the 500-year flooding. And what Dr. Bedian did is he took the actual measurements from the USGS, from the rain gauges, from the flow meters operated by the MWRD and others, and took the real data from the field, plugged it into Dr. Garcia's model, and came up with different results. And the results he came up with said, gee, it should have looked just like the 100-year flood that I am observing in the FEMA floodplain. And he said – so at the beginning of that inquiry, Dr. Bedian is at odds with Dr. Garcia because instead of tweaking his model to make it explain or justify a 500-year flood on a 100-year rainfall, he used real data to model what an actual fact happened and then explain the various mechanisms attributable to the MWRD's infrastructure and apparatus that caused the additional flooding. And in Judge Cohen's order and certainly in the MWRD briefing, they made a lot of hay about all – there can't be any additional flooding or if there was flooding that predated it, then it can't be a taking. And it is here as well, and here's why. The three main mechanisms that Dr. Bedian observed and opined on were the fact that Bellwood and Hillside have a combined sewer, very old combined sewer. And what the MWRD did at their Westchester pumping station was to pull water off that combined sewer and confer a benefit on everyone in the community by taking some of that flood water away. But when they did that, they pumped that excess flood water into the Addison Creek downstream of its junction with Salt Creek. And what Dr. Bedian said is that the introduction of that additional flow caused a backwater or backponding where now the Addison Creek cannot evacuate as much flow or runoff as it normally would. Because you're pulling this additional flow of water from the community at large and pumping it into Addison Creek. And that caused Addison Creek to overtop its banks and flood, amongst others, my clients. And he also said that when you do this, the outfalls, the emergency overflow outfalls from the combined sewer of the Hillside and Bellwood, their outfalls are along the banks of Addison Creek. So when you cause the overtopping of the banks of Addison Creek by introducing this additional flow, you've now reduced the ability of the combined sewer to have its emergency outflow and not cause the flooding. And Dr. Bedian pointed to the very evidence that the MWRD and Judge Cohen said we didn't have. He said, well, what if the structure wasn't there? What would be the flooding there? He doesn't have to calculate it because it's already been calculated. The floodplain, the 100-year floodplain, 500-year floodplain, just to explain, I'm sure you all know this, but it's based on a 100-year frequency of a severity of storm, 500-year frequency of a severity of a storm. Obviously, 500 years more severe. He said, look, here we know in the government, FEMA, even the insurance floodplain that MWRD and Garcia relied on says here are the boundaries of the 100-year flood. And the flooding from this July 23rd, 24th, 2010 flooding went beyond that. And it looked more like it matched the 500-year flood. And the reason... I want to just interject as far as your time here. If you are going to address the actual amount of flooding, I think you should do that as well. Sure. Let me go right to my... Thank you, Justice. I'm going to be cutting you off in about two minutes. You still have time for rebuttal, but you should address this. I welcome everybody. Certainly, my staff has heard enough from you, and you probably have too. But in my clients, for example, Ms. O'Connor said the flood was one day. Mr. Ward said the flood was two days. Mr. White, this is at C4586 and C4369. Mr. White said there was four to five feet of water after three days coming back to his property. That's at C4686. If you want to know about prior floods, my clients, Ms. Partee, had said there were two prior floods before 2010. That's C4419. Mr. White said there was one prior flooding, four to five feet of water. And then another flooding subsequent in 2013. That's at C4688. And the severity, which I think is what you asked for, Justice. Ms. O'Connor said it gutted her entire basement. She had to replace her heater in her water tank. That's at C4373. Mr. McElroy said he had to replace paneling, replace walls. He had to have mold testing and remediation and replace drywall. That's at C4324. His mother's apartment that also is in Bellwood, Mr. McElroy said she lost just about everything. The home had to be completely gutted and remodeled. Ms. Partee said she had to get a loan because the repairs were so significant and the damage was so significant. And at the time of her deposition, she was still paying off that loan. Water was coming in through window wells on the first floor and it was rushing in all the way up to the second stair of her basement. That's at C4407. The walls up to her waist and floors, her dryer, her water, her hot water tank and her furnace. That's at C4411 and C4412. I'm going to let you have time for rebuttal, but in the interim, I'm going to turn it over to our panel members to see questions that they may have. Very good. Sorry. It's all right. So, Justice House, do you have questions at this time? Oh, your microphone is off. No, I don't have any questions. Thank you. All right. Justice Ellis. Sorry, I had to unmute. I've got a bit of a cough, so I'm trying to be off audio when I need to be. Yes, just a few questions. Good morning, Mr. Dunn. Good morning. So, the district says that your expert failed to identify, he failed to investigate whether there were any other potential causes. I mean, they focus in their causation argument a lot on the fact that showing that any of their misactions, I'm trying to stay away from tort causes, but their negligence, whatever you want to call it, was merely a contributing factor is not enough. You have to show this wouldn't have happened without the affirmative steps they took. And they say that you can't show that because while your expert said a lot, he didn't rule out other causes or investigate even other potential causes. He talks about the intensity of the rainfall being one, the local sewer system. Yes, so please, however you want, I want to give you the floor to respond to that. Certainly. In the Idacare Farms case, that is 151 Federal Claims, 560 Idacare Farms v. United States, it's a 2020 case, so it's posted in Arkansas. In that case, they were, it was expressly said that it's sufficient to show that there was additional flood. It is not a bar to a takings or certainly not to a constitutional damages claim to say that you had to have no flooding unless the government actioned. In fact, what Dr. Bedian did in relying on Dr. Garcia, Dr. Garcia actually modeled what the flooding would have been like with one pump, two pumps, three pumps, four pumps each individually. And Bedian relied on that. And he said that, that modeling shows what the difference was because in a simplified fashion, when the wet well of the Westchester Pumping Station reaches a certain elevation, they know from prior operation of the pumping station as well as their testing and prior modeling that there will be widespread flooding in the community once that elevation wet well rises above 36 feet. And during this rain event, it rose above 37 feet. And they've characterized Dr. Bedian's criticism saying that, oh, well, it was a failure to run a pump. That's not true. There wasn't, it wasn't that there was no government action. It was that they used their apparatus as intended. And they had four pumps that would have kept that elevation below 36 feet and would have avoided the widespread flooding, but they operated it as intended, which was with the two pumps. And that was modeled by Garcia and then adopted by Dr. Bedian. Again, going back to my earlier comments, Dr. Bedian, there's no requirement Dr. Bedian has to do his own modeling. But he did rely on Dr. Garcia's modeling to show what would have been the flooding in the absence of government action or in the presence of alternative government action. And it's not just Idacra Farms. It's, again, referring to pages 8, 9, and 10 of our brief. There are other cases, both in the federal court of claims as well as Illinois, that talk about if you can show that the severity of the flooding was increased or caused in part by the actions of the government, then that can be a takeaway. And that's exactly what Dr. Bedian has done. He just took issue with how Dr. Garcia ran the models, what input he put in, and the bias that he used by multiplying all of the inputs that he had, either correcting them upwards or adding to their values in order to get out of the 100-year rainfall, which was 6 to 7 inches, and get into the 8 to 9 inches, which was more like a 400 or 500-year flood. Those numbers don't exist in the rainfall numbers. They only exist in the biased conclusions of Dr. Garcia and Dr. Bedian. He's pretty clear about that. Well, I appreciate that. And I understand that there is a difference between saying we didn't cause it at all and we added to the severity of it. And I understand that if it's just the latter, you could say that's a question of damages, that we've established our liability, but we don't get liability for all of the flood, just the part that was more severe because of our mistakes. But I believe the district is saying that you didn't even show that. Oh, I think we did. And I think it was as simple as Dr. Bedian saying, rather than manipulating the rainfall in the output of the model to say that somehow it caused a 500-year flood, that the rainfall, the flood only comes from the rainfall. So, you can't make up rainfall. And that's what Garcia did. So, he said this rainfall should have caused a 100-year flood. And we saw a 500-year flood. And everything beyond that 100 to 500-year flooding, as it relates to the plaintiffs who lived in the Westchester Pumping District and in the overrun of the combined sewer. But Mayfair Reservoir was different. He was even more clear there because he said, look, they built this reservoir that is an artificial, unnatural accumulation of water at the top of this hill. When that overtopped its banks, it then created a river down Carlisle Street, causing flooding in people who were not in any floodplain. These people would have never flooded. But for the fact that the Mayfair Reservoir was constructed there, and in the intended use of that reservoir, it caused this overland flooding or street river, which caused substantial flooding. We're talking the two clients that were there had three to four feet of water in their living rooms on the first floor of their house and five to six feet in their basements. This was catastrophic flooding that caused people to have to leave their homes, that created black mold, that they couldn't live in their homes. And Mr. Ward, as I was going to say, his home suffered about $120,000 worth of damage. And the case law is clear that just because it's damage that can be repaired doesn't mean it's not a taking. Of course, any damage can be repaired. You could knock a house down and repair it, reconstruct it, but it doesn't require the destruction. All that's required is government action that creates the right to do it again. And Dr. Bedian said, they said everything they did, their operation of the Mayfair Reservoir, their operation of the pumping station was as intended. Everything went as planned. And so there's no evidence in this case that they won't do that exactly again during the next rain event. And because of the mechanisms Dr. Bedian testified to, the flooding will happen again. So your position would be that you have shown, but for causation, maybe not for all of it, but to the extent it was more severe than it should have been. You can't blame all of, tell me if I'm saying this wrong, please. You can't blame the district for all of the flooding. But you can, I'm not sure that is what you're saying, actually. Let me be clear. Let me be clear. Dr. Bedian said, if none of the apparatus was there, we'd be in a hundred year floodplain. And now what we have is a hundred year rainstorm or a hundred year rainfall. And because of the operation of the MWRD's apparatus and infrastructure, that produced a 500 year level flood. And that's why my client's homes flooded. And that's why the people on Carlisle Street flooded. And that's why this is the result of government action. Whether we show it by saying, well, if it wasn't here at all, yes, there'd still be some flooding, but it wouldn't be as severe as having a 500 year flood during a 100 year rainstorm. And similarly, in operating the pumping station and pulling that water, that's one thing that we are going to bring. They're required to show, MWRD is required to show, the special benefits that we, my clients, received as a result of their operation of their apparatus. They did no such thing. Garcia didn't do it. Nobody did. That evidence is absent from the record. But we said, look, because they caused this back pining, because they pulled water out of other areas of the community and focused it on my client's homes, who are along the banks of the Addison Creek and who are on the downhill path of the natural flow Mayfair Reservoir and over Tops and Stakes, that is because of government action. And when there's government action for public use, for the benefit of the public, and it causes damage to the property such that the investment expectations of the owners are significantly interfered with or destroyed, then just compensation is owing. And that's why we're here. That's why we were here in the Supreme Court before. And that's why we think this motion for summary judgment should be reversed and denied and, in this case, should be remanded for trial. Okay, so I was just trying to remember back to some of the arguments that the district made, and they'll have their chance, but I want to hear it from you. So they said that Bedient, I think they said that he didn't assess whether rainfall alone caused, whether flooding was attributable to rainfall alone. And he didn't assess whether the problems with the local sewer systems could have caused it, or he didn't assess their contribution to it. And your response would be, what, that even if, so you saw, I'm sure you read that. I know you know they made that argument. What is your response to that? Well, he made two things, two things to address that, Your Honor. Okay. One, in his report, he said there was other flooding that actually had more rainfall. 1987 before the construction of parks, and 2013 after this flood. And they had more, the same or more rainfall, and yet they did not have this extent of flooding. And here in 2010, because they operated the pumping station as they did, it resulted in the widespread flooding. Because of their manipulation of the combined sewer, because of their operation of the pumping station, because of their introduction of this excess flow to Addison Creek, causing it to overtop its banks, it's a domino effect. Dr. Bedian said in his deposition, it's very difficult to model these things exactly, because you're talking about modeling rainfall in a flood over an enormous area of land in communities. But here's what we do know. In the Army Corps of Engineers overland study, they relied on the storage capacity of each of my clients' basements, and all the basements in that community, as part of how they're going to store flood water. And I think that's a really important fact for the public policy aspect of this case, because if they already knew where they were going to put the flood water, and they were already relying on my clients' basements, my clients' homes, as a storage place for that flood water, then that is, who is more equipped to bear the cost and expense and inconvenience of that loss? Is it the individuals who have the misfortune of being in harm's way, created by the MWRD, or is it the taxing authority and the taxpayer? The takings clause, I believe the case law is clear, says that that's exactly where the government should be the responsible party for that taking. And I'll also be clear, regardless of whether there's a taking or not, we think it's clearly it is, and BDN has supported that. Even if there's not, there is a constitutional damages claim under the additional protections under the Illinois Constitution, and that's important because all we need to prove there is a government action for public use that has caused damage. We've certainly proven that, and Judge Cohen didn't address that. So, I'm sorry, but as you can imagine, you're better equipped to discuss this than I am. Let me try and help as best I can. So, what I asked you was, and I wish I could find it in the brief, but BDN, okay, actually, I did find it. BDN acknowledged that local sewer systems can independently flood during storms that exceed their design capacity, but he failed to assess any of the local sewer systems connected to plaintiff's properties. And I think what I heard you say is he did assess it. He did it by comparing a previous storm to this one and said, this is what happened with the previous storm. This is what happened this time. So, those sewer systems can't be the difference. That's part of it, Justice. You have it on the nose, but he also said, look at the comparison of the floodplain. And because there's much more testing behind the floodplains, FEMA floodplain, than either Garcia or BDN ever did. And these were government independent actions. And, yes, some of my clients live in a floodplain, but as the case law is clear, just because you live in a floodplain doesn't mean that your investment backed expectations of your property is that you're going to be flooded by government action. And just one last thing, page 10 of our brief, Justice Ellis, also addresses our argument on that very point that you brought up to me. We cite to Mildenberger and Big Oak Farms. Yeah, I got that. Okay. Thank you, Justice McBride. And thank you, counsel. I'm good. Okay. Well, I do have a couple points. I'm not sure that the answer to Justice Ellis' question, but you agree, don't you, that a cause, a contributing cause, is not sufficient? There must be a but-for causation. Would you agree? No, I don't agree with that. I think that Idacare Farms and is it Kebidoo? No, I'm sorry, Justice Cohen. Well, so you don't, as far as you're concerned, there is no but-for causation. And, Judge Cohen, that's kind of what he said, that you had not established that. But today you're telling us that that's not really the test because of one case you're relying on. No, because of multiple cases in the Hampton case where Dr. Bedian, I think there's a subtle point here, Justice McBride. Did Dr. Bedian do his own calculations or create his own model to show what the causation was of the government action? The answer to that question is no. I'm not really trying to pierce whether that he didn't do modeling is the answer to the question. My question is, you do not believe there's a requirement that your experts say that but for the actions of the district, this flooding or the extent of the flooding would not have occurred. No, he did say that. He did say that. All right. So you're saying he did say that. But Judge Cohen, and of course, we're reviewing this de novo. It has nothing to do with his review. You're saying Bedian did say that but for the actions of the district, the flooding would not have occurred. No, he said, but for the actions of the district, the flooding would not have been severe as severe. And that's he said. He said there's 100 year rainfall in a 500 year flood. And he is endeavor was why. Why did that happen? And in his report and in his deposition, he then went on to say is because of the operation of the pumping station. It is because of the introduction of the additional flow into Addison Creek that everyone flooded of more more severely upstream. It is because the Mayfair Reservoir was overwhelmed with a river down Carlisle Street that otherwise would never have existed if the reservoir is not there. That's what he did say. And we are in our brief. And to you now, I am saying that the Idacare case, the big old farms and upstream addicts all stand for that proposition that we don't have. I believe that the laws we don't have to show that we're asking government action to be no foot. I believe that we have to we have to be able to show distinctly what that difference is. And Dr. Bedian did, in fact, do that when he compared the 100 year. You're saying that, but for their actions, it wouldn't have been as severe as it was. Correct. Correct. And that's all you have to show. Correct. Yes. Okay. All right. Any further questions from the panel members at this time? I'll take that as a no. All right. You'll have some time for rebuttal. I believe you may proceed. Good morning, your honors may please the court George me a lot on behalf of the Metropolitan Water Reclamation District in greater Chicago. Your honors this case arises out of a historic. Brain event 1 that the US federal government. Officially declared a natural disaster, like thousands of others in Illinois. When it's flooded, unlike everyone else, they've sued the district for their flooding and they're essentially arguing the district didn't do enough to protect their homes. But the district can't ensure every property and go county against flooding. And importantly, the law does not require that they do so. And the lower court agreed, and it dismissed 1 count of plaintiff's complaint and later. Brandon summary judgment on the remaining counts and your honors that's today. We're asking you to affirm those decisions. As to the dismissal, as, you know, that's the section 19 claim and we don't believe it's appropriately before the court. But even if this court finds it has jurisdiction, we think section 19 simply doesn't apply to this case. To the summary judgment question, which that ruled on constitute through 4 plaintiff's complaint that alleged state and federal takings and constitutional damages your honors. We believe you should have a firm judge Cohen's decision because on this record. On this record, plainness can never meet the requirements for their constitutional claims. And it's important to note that judge Cohen determined that they need a single requirement for their constitutional claims. So, what does that mean? It means that for a reversal here, plaintiff's got to run the table. They've got to show that judge Cohen aired on every single determination. They can't do that. Sorry, judgment should be affirmed. Now, your honors, you have our response for you. And I don't want to pair it all our arguments in that. I'll use the remainder of my time. Just emphasize a couple points. And respond to some of the things that plaintiff said in their reply brief and here at argument today. First point I want to make is a critical one. It is well established law. That there can't be a constitutional claim. For a government's failure to act. Black letter law. I'm not aware of we're not aware of a single federal or state case. It's found government liability on a constitutional claim. For government inaction, but in essence, that's what they're arguing here. Their argument is that the district failed to do more specifically. Feel to operate more pumps at the Westchester pumping station. And fail to provide more storage capacity at the reservoir. These allegations of an action simply cannot be the basis of a constitutional claim. And for that reason alone, your honors, you can affirm judge Collins. Ruling on some objection. To the next point, which you spent, which kind of spent a lot of time on you guys had questions on. The material deficiency. In plaintiff's causation evidence, your honors, the law is clear. We've cited in our briefs. From the highest courts of the land. That to establish causation. In a constitutional claim. A plaintiff must show, but for causation. They just mentioned the big case, which is a lower court decision, but like. The US Supreme Court's decision, like the federal circuit. In upstream addicts that says contribution is not enough. That's black letter law. The other thing plaintiffs fail to prove is also a necessary requirement for causation in a taking. Remember, we're talking about a taking here. An appropriation of property. The plaintiff has to show that. The harms of the district's infrastructure in question. Are greater than the good they cause, so they have to show that. The district's infrastructure caused more flooding than it prevented. And the case law is clear. That means all of the district's infrastructure. Everything the district does for stormwater. So, what did their experts say? And by the way, they're expert. Is the only causation witness. It's undisputed that their fact witnesses won't say anything on causation. Their whole case is on video. This isn't about weighing expert testimony. This isn't about a fact question. Take our expert testimony, put it aside. Take our fact witness testimony. Put it aside. Let's assume everything Dr says is true. When asked that his deposition. If he analyze or had an opinion on, but for causation, he simply said, no. No need to complicate this go straight to the deposition citation in the briefs. He was asked, and he said he didn't do that. When asked whether he analyzed. Whether the harms of the district's infrastructure outweigh the good. He said, didn't analyze it. No opinion. So, no opinion, no analysis on 2 critical factors for causation that your honor is undisputed. And you can just look at his own words in the deposition testimony. But it gets worse for planners because not only did he fail to do anything on those 2 critical points. But he also said that he could not, he didn't do an analysis of and could not provide an opinion of. What amount of flooding was contributed by the district infrastructure in question. He didn't do an analysis, an individual analysis for any of the plaintiffs in this case. This was a general, just a general analysis and that your honors is not sufficient for a constitutional claim. It's conjecture at best. Conjecture is not causation. This failure dooms plaintiffs claim. Moving on your honors, I think it's important to highlight. That neither the Illinois or US Supreme Court. Has ever found has ever found a taking for just a single instance of flood. In fact, the opposite has happened here in Illinois in this very case. The Illinois Supreme Court based its rejection of plaintiffs. Takings claim in part of the fact that they just alleged 1 instance of flooding in their original complaint. And more importantly, your honors. The US Supreme Court after the Arkansas case. Recently, in fact. Declared that isolated flooding. And not be a taking at best. It's sort. But it's not a taking and they reminded us that this principle is firmly grounded in over a century of US Supreme Court jurisprudence. Your honors here, we have over a 3rd of the plaintiffs admitting. They only had 1 flood the flood in 2010. That's undisputed for the remainder. The only flood they have in common is the flood in 2010. That's undisputed and here's the biggest point. This might be 1 of the most important things I say today. None of their experts provided an opinion about any flood other than 2010. So, what does that mean? It means that for causation. None of the plaintiffs here could show flooding for any date. Other than the date in 2010, it's a 1 flood case. And, and when we asked Dr. B, Dr. B in his report expressly said he limited his opinions to 2010. He said he was retained for the sole purpose. Of looking at the 2010 flooding event. And 1 asked, he said the 2010 flooding event is the only flooding event he looked at in detail. And you could see it from plants on discussion here. Everything he was reciting was about the 2010 flood. This case originally was about the 2010 flood. The Supreme Court rejected it, they amended, but ultimately we've come back to the same thing. This is a 1 flood case. That's not enough for a taking. Finally, your honors, with respect to constitutional damages, a critical point. The Illinois Supreme Court has made clear that for a plaintiff to receive compensation on constitutional damages. They have to be damaged specially and individually in a manner not common to others. We have the opposite here. If you look at plaintiff's own amended complaint, paragraph 48, that's C804 in the record. They state as follows, that they suffered flooding of similar duration and magnitude. And in fact, we know that this flooding impacted not just the people in their neighborhood. Not just the people in their communities. Not just the people even in Cook County. FEMA declared a natural disaster for seven counties in northern Illinois. There were over 100,000 homes and businesses that flooded. There was nearly half a billion dollars of funding that was granted by the federal government. This is the level of rain that we're talking about here. This kind of common damage is not the type of damage that the Illinois Supreme Court recognizes to be compensated on the constitutional damages. In closing, your honors, I do want to say, I want to quote. You're just about over your time. Go ahead, please. Yes, please finish up. I appreciate it. I just want to quote this court's unanimous published opinion in time Cicero versus MWID. Where the court, this court said Cicero's expansive view of section 19 could create unlimited liability for the district. And would effectively make the district an insurer of the public's property. Your honor, the same applies here, not just the section 19, but to point this expansive view of the takings and constitutional damages claims in that case. And I really hope, your honors, it's not lost on the court. The gravity of this case, not just for the district, but for all public municipalities. The bottom line is taxpayers cannot insure every Illinois basement against flooding. For that reason and everything else I mentioned in argument in the briefs, your honors, we ask that you affirm the rulings below. And I'm happy to take questions at this time. Justice Ellis, do you have some questions at this point? Yes, just a couple. Good morning, Mr. Mealopolis. So. I want to make sure we're not just getting cute with our language here. When when you say in your brief. That did not conduct an independent study or did not, you know. Conduct a study, you know, what I'm hearing the plaintiffs say is, well, we didn't do our own study, but he analyzed the one that Garcia did. Is that what we're talking about here? The difference between him doing his own study and and just critiquing the one done by Garcia? No, your honor, we're talking about something much more critical. He was asked if he had an opinion. If he had an opinion on the but for causation, if he had an opinion on what and he said, no. Okay, so that was my next question. I think you said both things and I kind of flagged them both in my brain. What's I don't know if you have the record right there with you. That's a broad statement. He had no opinion on but for causation. I mean, I'm hearing the plaintiff say, well, he didn't testify that. If but for M.W.R.D.'s misconduct, if you want to call it that, there would have been no flood. They're not saying that, says Mr. Dunn. What they are saying, though, is it wouldn't have been as bad. It would have been a hundred year, not a 500 year or would have been whatever. That difference from 100 to 500 wouldn't have happened if you guys hadn't screwed up. I'm speaking colloquially, but that's his position. And he certainly seems to think that that's what Mr. or Dr. Bedian said. When you say to us that Dr. B. And said he had no opinion on but for causation, no opinion on but for causation. As to what specifically? As to the cause of plaintiff's flooding. And that's straight out of the deposition. It's fatal to this case. As to the cause of the flooding. As to the cause. And your honor, what's striking is that Bedian in the upstream addicts case that's cited by both of us in the briefs. Bedian was retained and he performed that analysis. It's not that it can't be performed. He performed it. He also performed a comparing of the harms and the goods. And look what the court said in that case. Yeah. Yeah, you made that. You're right. I saw that in your brief. That's a good that's a that's a good point. I was trying to put on what I'm trying to do is trying to figure out what was different about Bedian here versus there. Not that that's the only case we're going to look at. So. So you don't read from his analysis. You don't read him saying whether he put it in terms of but for or not. You don't read him as saying that this flood would have been less severe if the district hadn't made mistakes that they made. No, and listen, your honors, I just want to point this out because I think this will put it in stark view. Dr. Bedian admitted that rainfall in and of itself is the primary driver of flooding. He can't say whether rainfall alone would have caused this flooding. Dr. Bedian said that local sewers, the district doesn't own local sewers. That's the local municipalities. They weren't suited. He said local sewers. In and of themselves. Forget about anything else, because they're connected to the point in and of themselves could cause this flooding. He didn't do any analysis of the local source. He said he testified that the local sewers were likely undersized in this event for this type of rain. He didn't look at and see what is was attributable to something that could be an intervening cause, right? Whatever happens at the district's parking station and the reservoir don't matter if the local system can't handle the rain that's causing the flood. And so this kind of vague causation testimony just doesn't rise to the level of a constitutional claim that we have here. Okay, okay. So respond to what Mr. Dunn said to that, because I asked him that very thing. And his response, I believe, and Mr. Dunn will have another chance. But I think what he said was, Dr. Bedian compared a previous rainfall to this one and said, why was it worse? And his conclusion was, because those same sewers were there before, and this didn't happen, this time it did happen. Is that not what he said? That's what he said, but that's not what the expert said. The expert said that the expert thought this was a 100-year storm. But they had some gauges in the waterway that suggested that the water levels of Addison Creek were at a higher stage than they would have been at a 100-year storm. But I don't even want to get into the back and forth on that. Let's just take that as true. That doesn't prove anything. That doesn't get you to the but-for causation that you need in this case. It's clear law that it has to be the but-for causation. The cases he even mentioned say it can't be contribution. And this, I would be remiss if I didn't mention, Bedian didn't do himself any other favors by also stating, by admitting two things. That rainfall was, in fact, a contribution in this case, the severity of rain. And that local, that creeks and streams can overtop on their own. And that the rising creek levels was a contributing cause in this case. So he's already telling us that other things contributed. That's already a problem. We could just leave it there. But then he goes on to say that creeks overtop naturally. And he can't say, he cannot say what amount from the district's infrastructure added to that. And, of course, again, he didn't look at any individual plaintiff's property. We have plaintiffs here, your honors, that had their windows open during storms. That didn't operate sump pumps. You know, there's other factors that had to be calculated to get to the level of a constitutional claim. And this is just woefully deficient. And this expert's done better in other cases. We can only speculate to why the necessary study wasn't done here. But at the end of the day, it's necessary. And Judge Cohen was correct to say that it doomed their causation requirement for the plaintiffs and their constitutional claims in general. Okay. Thank you. Thank you, counsel. Justice House, do you have questions at this point? I think Justice Ellis adequately covered it. Thank you. All right. I have a couple of questions. You would agree that a one-flood case can amount to a taking, right? I mean, the law pretty much has said that, right? You said this is a one-flood case, so it's out. But that's not really an accurate portrayal of the cases, is it? No, your honor. The U.S. Supreme Court in Cedar Point said an isolated flooding cannot be a taking. Okay. So Cedar Point was the more recent case. Yeah. Okay. All right. So under Cedar Point, a single flood cannot amount to a taking. All right. So in this case, I think there was maybe one couple plaintiffs left that mentioned they had some, I don't know, seepage or something, or that they had previous flooding. But everyone else, I mean, there are two big issues here. But for causation and whether or not this was a flood that caused. The nature of the flood was such. So is that an accurate portrayal of the remaining plaintiffs? Yeah, the remaining plaintiffs, you know, the majority of the plaintiffs had two floods or less. There's plenty of case law that says two floods are not enough. Remember, well, let's think about takings now here. It's a continuum, right, from tort to a taking. There's a continuum. And, you know, with one injury, you're in a tort. At some point, there's a series of injuries that gets us from tort law to property law. And there's an appropriation of properties. There's a servitude. And so courts have required much more. But there's never been an Illinois or Supreme Court case that has ever required anything less than recurrent flooding. And the verbiage that's used is frequently recurrent flooding. And so we don't have anything close to that here. The best they have on a minority of the plaintiffs is random flooding that's spaced out over years. And one important point that might be lost on somebody who's not really steeped in details of this case is, Your Honor, the depositions in this case, they happened 10 years after the case was filed. Well, I think the depositions indicate that it was actually only one couple, a married couple, who testified that they had other flooding. I don't think there was any other deposition that indicated other than saying we had some seepage. But I think at the end of the day, we were left with one couple. You also said, though, that this is really a non-action case. Now, the case law says that non-action cannot amount to a taking. But are you being, you know, is that a reasonable interpretation that the testimony from Pediant was that it was just non-action? Or is that really a fair interpretation of the evidence in its entirety? Yes, Your Honor, it is fair. It's in their briefs as well. They're saying we did not. This is great. They're saying that the pumps do reduce flooding. We operated two. They said you should have operated four. So they're just saying we didn't do enough. We didn't do enough. They're conceding that they helped flooding. They said you should have operated more. Same goes for the reservoir. It's about the storage capacity. They say, of course, it's common sense. Of course, a hole in the ground is going to collect water that would otherwise inundate the surrounding area. They're saying the hole should have been bigger. But you're absolutely holding firm to your position that their allegations are strictly that the non-action was the damage, the flood damage, not actions that they took or that they intended would result in the damage that occurred. Yes, Your Honor, that is our firm interpretation of their expert testimony. That's the only causation evidence they have. They did start- Did you lose me for a minute there? I think I may have frozen. Yeah, it says my internet connection is unstable. No, we lost your picture, but we heard you. Okay. All right. Go ahead then, Counsel. Thank you, Your Honor. The best they can say is their first expert opinion said that the district shouldn't have pumped at all. That added water to the waterway. Then they saw our expert's opinion and completely did a 180-degree turn and said, actually, you know what? The pumps do help, but now we know you operated two instead of four. You should have operated four. The absence of this case is you didn't do enough. And that's always been the case. And that simply cannot be the basis for a takings claim, and the law on that is Blackwater law. All right. Any further questions at this time for Counsel Varela, please? Mr. McLaughlin? Could I briefly follow up? I'm sorry. Really just off of what was just said. Mr. Milopoulos, I think what Justice – I kind of have the same thought, I think, that Justice McBride does. A lot of times when somebody engages in an affirmative act, but they don't do it the right way, you could probably, if you're clever enough, try to recast that as a failure to do something, right? Like if I, you know, run my car off a cliff going 50 miles an hour, I failed to reduce my speed. But I wasn't – it wasn't inaction. It was action done negligently. And part of what was negligent is I didn't slow down. I mean, if there's a flood and I say, you know what? I know how to respond to this. I'm going to pull these two pumps. I'm going to activate these two pumps. And I should have activated a third. Okay, one way of looking at that is you failed to, you know, you failed to activate the third and fourth pump. But another way of looking at it is you did act, but you didn't do it the right way. Like those two things can't be the same thing, can they? Your Honor, I would just refer you to a case that's handled this question head on. And that's the Board of Issaquah County case that's cited in our briefs. And the court there said that failure to build more pumps cannot be taken. That's inaction. That's not action. That's inaction. Failure to build more pumps or to activate more pumps that are already built? To add more pumps to pumps that are already built. Well, sure, but that's different, right? That's saying you didn't set the system up well enough. And that is inaction. I mean, you know, if a system's lying around for a long time, a big, you know, rain comes, and they did not have it properly equipped to deal with it, sure, that sounds like a failure to act to me. But if you have it in place and you make a decision not to activate a pump that you could be activating, that sounds like you did act, but negligently. I mean, these are all allegations. I'm not saying you did. But that sounds to me like a claim that you failed to act or that you acted in an improper way, not that you failed to act. I mean, right? I mean, you can always recharacterize and say, oh, it's a failure to act. But this doesn't sound to me like a failure to act. Why am I thinking wrongly about that? Well, because I guess first there's an underlying assumption that there was a decision not to operate those pumps. But if we agree. Okay, well, why don't you elaborate on that? I don't know what you mean by that. Well, it's not clear in the record why the pumps weren't operated. But so, A, it could have been that the pumps were out of service. Now, does that mean that the district, does that mean that that's action for the district to have pumps go out of service? And I think it's a stretch here. And I think it's a spin of the fact that the district was already providing flood protection. And you could always do other, we could come up with a bunch of other things that the district, they could have driven trucks to the area and, you know, put up barricades or, you know, your imagination can run wild with any number. Yeah, but that sounds like a failure to act to me. I mean, that is a failure to act. They didn't dispatch trucks. They didn't, you know, send, you know, whatever. They didn't parachute in, whatever. You know, that sounds like a failure to act. I think what they're saying here is you had resources that you didn't use. And that feels different. Okay. Let me just, if I may, because I don't want to dominate the time. Can I ask you one more question? You've talked a lot here about a single flood, that there must be frequent flooding. You talked about some case law. Is what you're saying there also applicable to the Illinois constitutional claims of taking? Because that has the word damage in it, which is obviously more than just a taking. I appreciate what you're saying, and I agree with you, that to actually say the government took your property, they've got to really mess with it, right? I mean, it's one thing to commit a tort. It's another thing to take it. But when they use the word damage in the constitutional provision, that sounds a lot more like a tort concept to me. Is there case law dealing with that that says one flood can't be damage, can't be a constitutional violation? Your Honor, we have case law from the Illinois Supreme Court saying that damage can't be temporary. And I can cite the Lepkowitz v. City of Chicago case, which said a three-year obstruction was not enough. But it's important to look at the history of that cause and why it was put in the first place. And this is a critical point, is that damages language was added in 1870. Before that, the Constitution provided just compensation for injuries to real estate. What the framers realized at the time in 1870 was there were some limited situations where the bundle of rights associated with ownership of real estate were being impacted to the point where it made the land valueless. And what was really happening was here in Chicago, there was a lot of development going on, particularly with railroads, and people's houses were getting blocked off to where they couldn't get access to their house. Now, there wasn't a physical invasion on their real estate, an injury to their real estate, but they were still essentially losing a part of the bundle of rights associated with their house. And the critical thing in the seminal case to look at is the Rigney case. That's the first Illinois Supreme Court case to interpret the 1870 Constitution and damages language. And the court there recognized that that language was added just to protect intangible rights associated with off-site activities, and it specifically mentions flooding as something that was covered by the pre-1870 Constitution. So I don't – the damages isn't a great fit here, but at any rate, in terms of the elements of that, the core elements are the same as the takings, and I can list for you Illinois Supreme Court decisions which individually tackle each of the elements, if you like. Okay, did I – that's okay. Did you cite these in your brief? I may have missed this part. Okay, so tell me the name of that case that interpreted the 1870. You said Rugner or something? Rigney is cited in our briefs, yes, absolutely. It is, okay. Okay, okay. Thank you. Thank you very much. Thank you. All right, I have a couple more. Now I had to think what I was going to be – I have a question. It's been alluded that the district is picking winners and losers on here. Where would this water have gone if they had operated the additional pumps? Where does this water go? If they operate the additional pumps, it goes to the district's intersecting source. Oh, I'm sorry, no, it goes to Addison Creek. It goes to the creek. Okay. But you reminded me of an important – I don't know. Was that the question? I think – I was getting the theme from the plaintiff's case is that they dumped all the water into the poor neighborhoods, right? I mean, the neighborhoods that are being identified here are not among the wealthiest neighborhoods in Cook County, right? I mean, I'm not saying you did that on purpose, but they aren't. I mean, you know, so I think what he's asking is have you activated – Justice House, I'm sorry if I'm not – I think he's saying if they did what the plaintiff said they should have done, where would the water have gone? Oh, into the creek that abuts their property. So, like, it's a creek that flows – there's no allegation that the pumping was somehow providing relief for other communities and not for here, and there's no evidence of anything like that. I mean, it's the opposite. The fact that we have a pumping station here and a reservoir here is evidence of the district doing more to prevent flooding in these areas. And, in fact, there's no evidence that the flooding in these communities is any different than anywhere else except for the fact that they did receive some of the heaviest rain. But flooding was – and the freeways were closed down in 2010. They shut down the CTA. I mean, this was a catastrophic natural disaster. Okay, I have a couple questions. Judge Cohen, it seemed to me, said that you can't have damages without establishing a taking. It seemed like he was – you know, that's how he was getting rid of that last – is that an accurate statement of the law? If there is no taking, there couldn't be these damages? We agree, Your Honor, in that the fact is that they share the same core elements. But – so they share the same elements? Do you need a taking for your damages? All right, Mr. Dunn is shaking his head, but – all right, I want to ask you. Let's assume that their allegations are about actions, not action. Would you say that the plaintiff's case is basically saying that because of their actions, the flooding was worse? That the flooding was like a – their actions caused this to be, in fact, a 500-year flood as opposed to a 100-year incident? But is that enough? Is that enough for – okay, you assume that they are claiming it wasn't just mis-actions or non-actions. You assume that their actions – again, though, I think that most – what I'm having trouble with is that I feel that Dr. Bedian said that their actions turned this into something worse than what it was. Is that really but-for? That it turned – that it was worse or – I don't know. Do you understand my question? Perhaps not. I do, Your Honor, and we don't think it comes anywhere near but-for causation. Well, okay. All right. Anything further before we turn it over for rebuttal? No, I don't. All right, Mr. Dunn, a brief rebuttal. May I mute myself first? Okay. Very briefly, Your Honor, thank you for giving me an opportunity for rebuttal. The entire argument that the MWRD advances about how one flood isn't enough is a complete error in interpretation. If you look at the Cedar Point case, which is 141 in Supreme Court 2063, the quotation that the MWRD uses to say that, quote, While a single act may not be enough, a continuance of them is a sufficient number and for a sufficient time may prove the intent to take property, they were talking about trespass. This is at page 160, 161 of the Cedar Point decision. In the very next paragraph, it said, and I quote, The distinction between trespass and takings accounts for our treatment of temporary government-induced flooding in Arkansas gaining fish. Simply and only that such flooding gains no automatic exemption from takings clause inspection. Because this type of flooding can present complex questions of causation, we instructed lower courts evaluating taking claims based on temporary flooding to consider a range of factors, including the duration of the invasion, the degree to which it was intended or foreseeable, and the character of the land at issue. So, applying those factors on remand, the Federal Circuit concluded the government had effected the taking in the form of temporary flowage easements, and they cited to Arkansas gaining fish. So that is a gotcha game that doesn't work. They misquoted the case law. And the gotcha moments extend to his quotation or the MWRD's quotation of Dr. Bedian's testimony. After Dr. Bedian gave 59 pages of testimony about but-for causation in terms of but-for the actions of the MWRD, the flooding would not have been of the 500-year ill. They then asked him slanted questions like, did you do your own calculation to determine the incremental flooding, which he said no. They were all slanted about did you do your own calculation or your own modeling, and he had to say no. And that's gotcha because the actual testimony, it's broad and de novo review here, is the exact opposite. He absolutely gave opinions about what part of the flooding was attributable to the government action and what part of the flooding was prior anticipated flooding based on the rainfall. And he did run the models of Dr. Garcia. In fact, his assistant, the key difference, and I think I said this in the beginning, but it bears repeating, his assistant took the actual measurements from the rain gauges and the flow meters on the ground on July 23rd and 24th, 2010, and he used those actual measurements as inputs into the model that Garcia used, and he came up with a 100-year flood. And it was Garcia that then had to take this next round rainfall modeling and multiply it by a factor of 1.5 and then correct the data higher in order to get the 100-year rainfall to produce a 500-year flood event, according to his models. And Bedian said that's not right. That's contrary to what happened on the ground. That's contrary to what the testimony is. That's contrary to my analysis. And when he saw that, he said that these mechanisms, the running the pump, taking the flood water off the community at large and focusing it on my clients, and you're correct. The residents of Bellwood are lower-income or medium-to-lower-income community, and they were taking flood water away from Westchester and Hillside, which is maybe medium-to-upper-medium income communities. And they focused it on these areas of people who have less of a voice, who have less economic power, who pay less taxes, and they're the people who are so vulnerable that they're the ones that can tolerate bearing individually the cost of these losses the least. They're in the least position, and they're the ones that I argue deserve the government's protection more than anyone based on what has happened here. And if you look at – we cited to a case called Berry, talking about the constitutional loss claim, the damage claim, without a taking. In that Berry case, they talked about looking at an inverse condemnation case and what had to – there had to be some damage and also maybe some property loss. I don't necessarily agree that that's the law of Illinois, but in this case, we not only showed that the severity of flooding was increased by the government action and what those damages were, we also retained a real estate expert who relied on the appraisals. His name is Justin McDaniels, and he relied on Michael Johnson, who was an appraiser, who actually did a community-wide study and found that our client's – our plaintiff's properties were in fact more negatively damaged and had their price – home values decreased more than the surrounding community, and he attributed it to the flooding because he saw that decrease in valuation over less than a one-year period. They didn't really mention that in their briefs, probably because it doesn't help their argument, but we had both areas of damage covered. The actual damage from the flood, the government-induced flooding, and the diminution of property values as a result of the flooding of these properties as opposed to other properties. The final point that I'll make on the one flood, although I think the Cedar Point case gets it, but if you look at the Idacard Farms case at page – yeah, I know, but I want to read in this here. It is true – this is at page 568, going on 569. It is true that the court – quote, it is true that the court found that any flooding attributable to natural causes as appeared to the corpse actions as opposed to the corpse actions did not break the chain of causation between the MRRP and the flooding on the representative plaintiff's properties. Skipping ahead to lower in that paragraph. Rather, the court concluded in phase one that the corpse MRRP actions in certain instances made the flooding more severe than it would have been had the MRRP not been in place. And Mr. Mihalopoulos admitted in his argument to you that had the reservoir never been there in the first place, it would have never overtopped and created this river down Carlisle Street. That's as clear as but for causation as you can get, as the court has explained it to me. The court goes on to say the court held that the course river changes have, together with the core system changes, caused WSEs to rise higher than they would have risen without these changes and led to more flooding or more severe flooding or longer flooding that would have occurred had those changes not been made. Skipping ahead to page 159. The court therefore agrees with the government that when examining the Arkansas Fish Factors as well as the compensation, just compensation, the court is tasked with determining whether the additional flooding caused by the MRRP is sufficient to meet the standards for the taking of a flowage easement, and if so, the value of the property interest it has taken. However, the court disagrees with the government's argument that quote, because plaintiffs failed to present any evidence of the amount of incremental flooding that plaintiffs failed to prove either liability or just compensation for their claims. In fact, the government's own experts opinions demonstrate that the representative plaintiff's properties experienced considerable losses. And that's what I meant is that here, Dr. Bedian has gone beyond what other experts have done in cases that found a taking and found a taking on a single flood. And the quotation to Cedar Point and Judge Cohen's repeated reference to a single flood can't produce a taking or a constitutional damages claim. There's no other saying it's just flat wrong. It's just wrong. And it's not surprising there's not a lot of Illinois jurisprudence on the facts because the Hampton Court in this case only found that Arkansas Game and Fish applied just 10 years ago. Before that, they were relying on Expro Pratt, which was interpreted as having a blanket bar on temporary floodings as takings, and that had been the precedent for 50, 60 years. So, you know, in conclusion. Judge Cohen made a number of mistakes. He didn't conduct a takings analysis. He didn't separate that from summary judgment. He conflated the standards. He mistook the need for a single flood or more floods, even though Dr. Bedian identified nine floods in his report at page five. And in doing so, he weighed, improperly weighed Bedian's testimony against Garcia's because perhaps he was of the impression that Bedian didn't do any of his calculations, his own calculations. That's not true. He just didn't do his own model. He used the model and input the real readings from the field during the rain event to explain why the additional flooding was attributable to government action and not from natural rainfall or other causes. And I thank you, all of you, Justices, Justice McBride, Justice Ellison, Justice House. Thank you very much for your time and your consideration of this matter. We appreciate it. On behalf of my clients. Do any of the other Justices have any questions at this point? No, I don't. I don't think so. I appreciate the very good argument from both attorneys. Yes. So, I don't have any further questions. We thank you both for the arguments today. The case was well argued and well briefed. We'll take it under advisement and court will stand adjourned. Thank you both. Thank you very much. Thank you. Thank you.